JOHN WITTMAYER, Otto Wittmayer, and Marvin Wittmayer, by John Wittmayer, His Guardian ad Litem, Appellants, v. SECURITY STATE BANK OF UPHAM, NORTH DAKOTA, a Corporation, and the Atlantic Elevator Company, a Corporation, Respondents.

(224 N. W. 303.)

Opinion filed December 28, 1928.    Rehearing denied April 8, 1929.

*Lemke & Weaver,* for appellants.

*Benson & Benson,* for respondents.

BERRY, Dist. J.   This case was here on a previous appeal.   See Wittmayer v. Security State Bank, 54 N. D. 845, 211 N. W. 436.

A statement of the facts sufficient to an understanding of this case is as follows:

In 1905, John Wittmayer, the father of Otto and Marvin Wittmayer purchased school land of the state, described as follows: $E\frac{1}{2}$ of section 36, township 160, range 78, in Bottineau county, North Dakota.   He received the usual certificate from the state and made the first payment on the principal as required by law and paid the interest and taxes until 1912, when he ceased to pay either.   John Wittmayer cultivated the land up until 1922 under his right as such purchaser.

On January 19th, 1923, the board of university and school lands adopted a resolution declaring John Wittmayer's contract for the purchase of said land void and directed notice thereof to be given to Wittmayer, who admits that he had notice thereof.

In 1923, John Wittmayer again cropped the land under a lease from

the state running to one Hanson. Hanson agreed to secure a lease for the year of 1924 for John Wittmayer, but did not do so.

In the Fall of 1923, before the Hanson lease expired, on January 1st, 1924, John Wittmayer seeded part of the land to rye. In the Spring of 1924 either John or his boys seeded the rest of the cultivated land to wheat and oats.

Wittmayer was indebted to the defendant, the Security State Bank of Upham, in a considerable amount. He mortgaged the land in question to secure his indebtedness. In July, 1924, one Grimes, cashier of the defendant bank, went to Bismarck, interviewed the land commissioner, learned that the records of the board showed that the purchase contract of Wittmayer had been cancelled, that the land was to be rented and the minimum price for which it could be rented. He returned home, went to the county treasurer, made a formal application to rent the land for 1924, up to January 1st, 1925, paid the treasurer the amount of the rent, which application and payment were sent to the land commissioner and, on August 1st, 1924, leases in the form used by the board were executed by the land commissioner and returned either to the county treasurer or to the bank, the record being silent on that point. But, on August 4th, 1924, the leases were in the possession of the bank.

On that day, August 4, 1924, Grimes, cashier of the Upham bank, went to interview John Wittmayer about the matter, told Wittmayer that the bank had leases for the school land and did not want Wittmayer to interfere with the crops on it. Wittmayer told Grimes he had no interest in the crops, that they belonged to the boys, meaning Otto and Marvin. In that talk Otto said, in substance, that he owned the crops and Marvin said nothing. The father, John, then came over and pointedly told Grimes to get off the place, and Grimes went. On that day Otto and Marvin were harvesting the rye, having, as the record shows, cut a few rounds around the field with a binder.

Before the afternoon of August 5th, John Wittmayer, as he testifies, directed Otto to go over to the Upham bank and see if some settlement could not be made in relation to these crops. That afternoon Otto appeared at the bank and, after much discussion, finally signed two papers, which are marked Exhibits 6 and 7, and are in evidence. One of them purports to be a waiver of all claims on the part of Otto to

any part of the crops under his father's contract of purchase or otherwise, and the other is an agreement that Otto shall harvest the grain, the bank furnishing the twine; that the grain shall be threshed and all hauled to the elevator and sold, and then, for his services, Otto should be paid one third of the net proceeds of the grain after all expenses were paid. On one of these documents Otto makes the statement that the Upham Bank is the "sole owner" of all these crops.

Grimes procured a threshing machine to thresh the grain. Before threshing he told Otto that he had the machine and the time when the threshing was to commence. Otto and Grimes say that Otto then told Grimes that he would not be home when the threshing commenced, but that he had arranged with his father, John, to look after his, Otto's, "share." John denies this, but when the threshing started he was on hand with teams and took more than one third of the grains, hauling them to his own granary. The balance of the grain was hauled to the defendant elevator company and apparently left therein without the issuance of storage tickets. When the grain was all in John told the buyer at the elevator, not in the presence of Grimes, that that grain was not to be sold until some settlement was made by the Upham Bank with him. At the request of the Upham bank, however, the grains were sold and the gross proceeds turned over to the bank, which deducted all expenses, including the rent it had paid for the land, and endorsed the balance on John's notes held by it and past due.

Plaintiffs brought this action for conversion of the grain. On the trial the jury returned a general verdict for the defendant and answered three special questions. The special questions and answers are as follows: Question: Were the crops on the premises described in the complaint on the 4th day of August, 1924, ripe and matured and not growing, although unsevered? Answer: No. Question: Did the defendant Security State Bank of Upham take possession of the 1924 crops upon said premises after they were severed and shocked? Answer: No. Question: Were the plaintiffs trespassers upon said premises prior to August 4, 1924? Answer: Yes.

Judgment was entered for the defendant on the verdict and from an order denying a new trial the appellants have prosecuted this appeal.

The first question raised by the appellants in their brief is: Who

was entitled to the unsevered crops? The law phase of this question was settled on the former appeal, as follows:

"Where a trespasser occupies school land, tills it, and plants crops thereon, such crops while growing and unsevered, belong to the state, and a general lease of such land, without restriction as to growing crops, passes such ownership to the lessee."

Appellants are contending that such is not the law and that it should be repudiated on this second appeal. We have again examined the authorities cited by appellants and feel well satisfied that we decided the question correctly on the former appeal. Furthermore, it is a well established rule that questions fairly raised and decided on a former appeal in the same action become the law of the case and are not open for consideration on a subsequent appeal. Such decisions are binding upon the parties and those claiming through or under them in all subsequent stages of the litigation. Schmidt v. Beiseker, 19 N. D. 35, 120 N. W. 1096; Smith v. Neufeld, 61 Neb. 699, 85 N. W. 898; Carpenter v. Carpenter, 126 Mich. 217, 85 N. W. 576. See also 11 Cyc. 757, 15 C. J. 961.

The fact phase of this question was submitted to the jury under proper instructions and the jury found that the crops were still growing on August 4th, 1924, when plaintiffs were stopped from harvesting the grain by Mr. Grimes. The answer to the question must therefore be that the defendant bank was entitled to the unsevered crops.

The second and third questions raised by appellants are as follows:

(2) Were or were not the plaintiffs in possession of the premises here in question by and with the consent of the board of university and school lands?

(3) Were the plaintiffs trespassers or tenants at sufferance.

The appellants rely upon a letter written by the land commissioner to Mr. Hanson as sustaining their contention that John Wittmayer was not a trespasser. We quote the letter in full as follows:

"Bismarck, N. D., July 26, 1924.

"Mr. H. N. Hanson,

Kramer, N. D.

"Dear Mr. Hanson:

"Your letter of July 21st in regard to E½ of Sec. 36–160–78 received.

"All rentals are cash and must be paid in advance, and this department is unable to protect your interest in the growing crops on said land unless the rent is paid. There has been so much trespassing in the past that members of the board have decided that in all cases where there has been any trespassing the rentals will be three times the amount required to be paid at this time.

"In other words where the rental is 50 cents an acre and it is discovered that land is being cropped the rental will be $1.50 per acre after August 15, 1924. Further any person who will at this time pay the required rental for this land is entitled to all grown or growing crops thereon, and it is absolutely impossible for us to protect your interest in the growing crops on the above described lands.

"Therefore I advise that you pay this rent before August 15, or you will be required to pay three times more thereafter and you are also taking a chance of someone's else leasing it away from you before said date.

> "Very truly yours,
> "State Land Department,
> "Carl R. Kositzky,
> Land Commissioner."

There was no acceptance of the proposition made by the land commissioner. We think the finding of the jury that Wittmayers were trespassing is amply sustained by the evidence.

The next question raised by appellants is as follows: (4) Was the lease made privately by Carl Kositzky, commissioner of university and school lands, and without the authorization, consent or approval of the board of university and school lands, valid?

The answer to this question is found in the decision in the former appeal in this case. Paragraph 3 of the syllabus holds that the commissioner is general agent for the Board, and that leases to defendant

bank for 1924 of the land in question are prima facie valid. But appellants further contend that the leasing must be made at public auction, claiming that the leases were secured by a private contract with Mr. Kositzky.

It is admitted that such leasing was made in conformity with § 344 of the 1913 Compiled Laws, but appellants contend that § 344 is repugnant to § 161 of the Constitution.

This precise question was raised in the former appeal and was decided adversely to appellants' contention. We feel that the same is not now open for consideration. We have, however, examined the question fully and have reached the same conclusion as announced on the former appeal.

Appellants complain that prejudicial error was committed in admitting evidence of the fact that John Wittmayer was indebted to defendant bank. This evidence was clearly admissible in support of paragraph six of defendants' amended answer, which alleges that two thirds of the crop was sold and after the expenses were paid, the balance of $1,515.85 was applied on a note of $2,845 which the plaintiff, John Wittmayer, was owing defendant bank.

The objections to the court's instructions are disposed of by the foregoing considerations. The instructions of the lower court were given to the jury in consonance with this court's former decision in this case. Those are the only ones of which complaint is made, and having decided to adhere to the law as declared on the former appeal, the instructions are therefore correct.

This disposes of all assignments of error which have been argued or raised in the brief of appellants.

We are satisfied that there was no prejudicial error committed by the trial court and that the judgment and order should be affirmed. Same is accordingly affirmed.

BURKE, Ch. J., and BIRDZELL, CHRISTIANSON, and NUESSLE, JJ., concur.

BURR, J., being disqualified, did not participate; Honorable H. L. BERRY, Judge of the Sixth Judicial District, sitting in his stead.